UNITED STATES FEDERAL COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| ABN AMRO MORTGAGE GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MAXIMUM MORTGAGE, INC., JUSTIN | ) | |
| STUCKEY, CARRIE STUCKEY, REX D. | ) | |
| WELLS, ACCELERATED TITLE COMPANY, | ) | |
| JAMES PAPPAS, COREY STUCKEY, | ) | CAUSE NO. 1:04cv00492 |
| STEWART TITLE GUARANTY COMPANY, | ) | |
| GREG CHEVALIER, APPRAISAL SOURCE | ) | |
| OF FORT WAYNE, INC., ALLEN COUNTY | ) | |
| APPRAISAL, INC., EILATAN, INDIANA | ) | |
| RESOURCE NETWORK, ALLIANCE | ) | |
| PROPERTY MANAGEMENT, RICHARD | ) | |
| ROLLINS | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff ABN AMRO Mortgage Group, Inc., by counsel, for its cause of action, alleges

and states as follows:

I.    PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff, ABN AMRO Mortgage Group, Inc. ("ABN") is a Delaware corporation

and wholly owned subsidiary of Standard Federal Bank.  ABN also does business as Interfirst

Wholesale Mortgage Lending.  Its headquarters are located at 6300 Interfirst Drive, Ann Arbor,

Michigan 48108-9130.  ABN is the fourth or fifth largest wholesale mortgage lender in the

country.  ABN is not a citizen of Indiana.

2.    Defendant, Maximum Mortgage, Inc. ("Maximum Mortgage") is an Indiana

corporation with its principal place of business located at 5714 St. Joe Road, Fort Wayne, IN.

EXHIBIT A

Maximum Mortgage is a citizen of Indiana. Defendants Justin Stuckey and Defendant Carrie Stuckey are principals of Maximum Mortgage.

3.      Defendant Justin Stuckey is a citizen of Indiana and resides at 4423 North Drive, Fort Wayne, IN.

4.      Defendant Carrie Stuckey is a citizen of Indiana and resides at 6208 Headwaters Trail, Fort Wayne, IN.

5.      Defendant Accelerated Title Company ("Accelerated Title") is an Indiana corporation with its principal place of business located at 1137 Rupp Drive, Suite 103, Fort Wayne, IN. Accelerated Title is a citizen of Indiana. Accelerated Title is owned by Defendant James Pappas. Accelerated Title is an agent of Stewart Title.

6.      Defendant James Pappas is a citizen of Florida and conducts business in Indiana.

7.      Defendant Stewart Title Guaranty Company ("Stewart Title") is a Texas corporation with its principal place of business located at 1980 Post Oak Boulevard, Houston, Texas. Stewart Title is a citizen of Texas. Stewart Title is in the business of providing title insurance.

8.      Defendant Rex D. Wells ("Wells") is a citizen of Indiana and resides (or maintains an office at) at 1616 North Harrison Street, Fort Wayne, Indiana. Wells is an individual who invests in residential properties in northern Indiana. Wells invests in residential properties both individually and through various entities under his control.[1]

9.      Defendant Eilatan is a name under which Rex Wells does business. Eilatan is a citizen of Indiana.

10.     Defendant Indiana Resource Network is a name under which Rex Wells does

---

[1] The allegations in this Amended Complaint pertaining to "Wells" relate both to Wells individually and to the various entities through which he conducted business.

business. Indiana Resource Network is a citizen of Indiana.

11.      Defendant Alliance Property Management is a name under which Rex Wells does business. Alliance Property Management is a citizen of Indiana.

12.      Defendant Greg Chevalier ("Chevalier") is a citizen of Indiana and resides at 1026 Lake Avenue, Fort Wayne, Indiana. Chevalier is an appraiser who, at different times since 2001, has been employed by both Appraisal Source of Fort Wayne, Inc. and Allen County Appraisal, Inc.

13.      Defendant Appraisal Source of Fort Wayne, Inc. ("Appraisal Source") is an Indiana corporation with its principal place of business located at 6030 E. State Blvd., Fort Wayne, IN. Appraisal Source is a citizen of Indiana.

14.      Defendant Richard Rollins ("Rollins") is a citizen of Indiana and resides at 725 Valdosta Drive, Fort Wayne, Indiana. Rollins is an appraiser who is employed by Appraisal Source.

15.      Defendant Allen County Appraisal, Inc. ("AC Appraisal") is an Indiana corporation with its principal place of business located at 4601 Oak Creek Drive, Fort Wayne, IN. AC Appraisal is a citizen of Indiana. Chevalier is a principal of AC Appraisal.

16.      This is an action arising as the result of a mortgage fraud scheme involving 149 mortgage loans (the "Loans") originated by Maximum Mortgage and funded by ABN.

17.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as there is complete diversity between the plaintiff and defendants and the amount in controversy exceeds $75,000.00.

18.      Venue is proper in the Northern District of Indiana, Fort Wayne Division because a substantial part of the events or omissions giving rise to this claim occurred in Allen County,

Indiana.

19.     Venue is proper in the Northern District of Indiana, Fort Wayne Division under 18 U.S.C. § 1965 because all defendants reside in and/or have an office or agent in and/or conduct affairs in Fort Wayne, Indiana.

II.    FACTS

    A.    WHOLESALE LENDING AGREEMENT WITH MAXIMUM MORTGAGE

20.     ABN buys loans from 4,000 to 5,000 mortgage brokers in all fifty states.  The brokers are agents of the mortgage borrowers, and assist the borrowers in obtaining a loan.  The brokers obligation is to gather all of the information necessary for ABN to make an informed lending decision, including completion of the loan application, verification of employment, appraisals, and verifications of funds on deposit and credit reports.  The broker then offers to sell the loan to ABN.

21.     In March, 2001, ABN and Maximum Mortgage entered into a "Wholesale Lending Agreement."  A copy of this Wholesale Lending Agreement, including the Addendum thereto, is attached hereto as Exhibit "A."

    B.    FACTUAL ALLEGATIONS RELATING TO THE NULL MORTGAGES

22.     In early 2002, the Nulls decided they wanted to work together and operate their own business.  The Nulls believed rental real estate could be a lucrative business and decided to investigate what was required to enter the profession.

23.     The Nulls spent several weeks looking at properties, and found four (4) residential properties to purchase.  In late March 2002, the Nulls contacted Maximum Mortgage to obtain financing for the properties.

24.     The Nulls described to Justin Stuckey at Maximum Mortgage their plan for getting into the rental business. Justin Stuckey told the Nulls that Rex Wells was one of the most experienced and successful apartment owners in Fort Wayne. Justin Stuckey also told the Nulls that Wells would be happy to speak to them about the business.

25.     In late March or early April of 2002, Justin Stuckey introduced the Nulls to Wells. At the initial meeting between Wells and the Nulls, held at Wells' office, Wells told the Nulls that they couldn't run a business with only four (4) units and that they were paying too much for the four (4) units they had identified. Wells also told the Nulls that their timing was good because he was "willing" to sell some of his properties. He indicated that he had decided to scale back his operations so that he would not have to work quite as hard.

26.     The Nulls met with Wells at his office several times during the first two weeks of April 2002. During the course of these meetings, Wells provided the Nulls with a list of properties he was willing to sell. The list included the address, the sale price, the appraised value of each property, and the amounts for which the houses would lease. Wells also indicated that most of the tenants were prospects to whom the Nulls could sell the houses on contract at a later date. Wells stated that he had been in the real estate business long enough to have a "good feel" for how the properties would appraise, and that the appraised values would give the Nulls a minimum of thirty percent (30%) equity right from the start. Wells told the Nulls that he could sell the properties for a higher amount if he listed them individually, but he was willing to take less if the Nulls purchased multiple properties at the same time. Wells also indicated that he had owned the properties for a number of years when, in fact, he had recently purchased many of the properties.

27.     The Nulls, accompanied by Wells, visited some of Wells' properties in early April

of 2002. Wells consistently diverted the Nulls' attention away from any problems with the properties. Wells would often indicate that the men could only spend a few minutes in each house "so as not to startle the tenants."

28.    The April meetings culminated in the Nulls agreeing to purchase the following 9 properties from Wells' list:

| | |
|---|---|
| 1. | 1043 Saint Mary |
| 2. | 1621 Saint Mary |
| 3. | 1614 High |
| 4. | 1320 High |
| 5. | 1129 Burgess |
| 6. | 1605 Third |
| 7. | 1716 Richardson |
| 8. | 612 Fourth Street |
| 9. | 1021 Tennessee |

A fixed price was not set for each house, but instead only the total price for all 9 houses was agreed upon. The closing for these 9 properties took place on April 17, 2002.

29.    The Nulls eventually bought more houses from Wells pursuant to the same practice. The additional houses were purchased in groups of 28, 18 and 24, with the men agreeing each time on a total price, not a per house price, for each transaction. ABN financed the Nulls' purchase of all 79 properties by purchasing the loans from Maximum Mortgage.

30.    The closing for the second group of houses took place on May 2, 2002, and included the following properties:

| | |
|---|---|
| 10. | 3221 Clinton |
| 11. | 2137 Eby |
| 12. | 216 Second |
| 13. | 1615 St. Mary |
| 14. | 1703 Franklin |
| 15. | 2421 Thompson |
| 16. | 1402 Tecumseh |
| 17. | 1325 St. Mary |
| 18. | 936 Rivermet |
| 19. | 511 Fifth. |

20.    528 Fifth.
21.    1613 Kentucky
22.    1329 Third
23.    532 Fourth
24.    5220 Reed.
25.    4329 Reed.
26.    3711 Newport
27.    5106 Lillie
28.    2408 Priscilla
29.    1954 Fourth
30.    538 Fourth
31.    536 Fourth
32.    1035 Franklin
33.    1609 Kelly
34.    5602 Buell
35.    673 Huffman
36.    1404 Dubois
37.    415 Agnes

31.    The Nulls had meetings with Wells at his office in late April to discuss purchasing the second group of houses. During the course of these meetings, Wells represented that all of the potential properties were in good condition and that many of them had recently had work done. In many cases, this was false.

32.    For example[2], Wells stated that the property at 673 Huffman had a good roof and new mechanicals. After the closing, the Nulls learned that the roof and two water heaters actually needed to be replaced.

33.    With respect to 1325 St. Mary's, Wells stated that the house had new plumbing and electrical systems. However, the Nulls learned after the closing that some of the plumbing was not even up to code. The Nulls were required to tear out a wall to replace the faulty plumbing.

---

[2]    Wells made misrepresentations regarding many of the properties purchased by both the Nulls and Brogren. The specific examples identified in this Complaint are intended to be representative samples of those misrepresentations.

34.     In early to mid May, after the second closing, the Nulls continued to meet with Wells at his office regarding the purchase of additional properties.  The Nulls eventually agreed to purchase the following properties from Wells:

| | |
|---|---|
| 38. | 3411 Senate |
| 39. | 718 Drexel |
| 40. | 1723 Howell |
| 41. | 2034 Phenie |
| 42. | 1328 Elm |
| 43. | 4405 Monroe |
| 44. | 3801 Barr |
| 45. | 2431 Ormsby |
| 46. | 5610 Bowser |
| 47. | 3417 Oliver |
| 48. | 4001 Hanna |
| 49. | 345 W. Rudisill |
| 50. | 3206 Central |
| 51. | 3510 Weisser Park |
| 52. | 1306 Elm |
| 53. | 3804 Oliver |
| 54. | 3805 Smith |
| 55. | 4034 Reed |
| 56. | 4336 Spatz |
| 57. | 2806 Knode |
| 58. | 3611 Lillie |
| 59. | 3806 S. Anthony |
| 60. | 1515 Rudisill |

The closing for this group of properties was May 23, 2002.

35.     Again, Wells represented that the properties were generally in good condition in his meetings with the Nulls.  In particular, Wells stated that the house at 4001 Hanna had a "new roof" that had "ten years left."  The Nulls eventually learned that the roof had only been layered with additional tar and actually needed to be replaced.

36.     The Nulls continued to meet with Wells at his office to discuss the possibility of purchasing additional properties in early to mid June of 2002.  The Nulls agreed to purchase the following properties:

| | |
|---|---|
| 61. | 4637 Spatz |
| 62. | 4501 Bowser |
| 63. | 4510 Oliver |
| 64. | 3925 Robinwood |
| 65. | 3305 Hanna |
| 66. | 543 Fifth |
| 67. | 1012 St. Mary |
| 68. | 1025 Franklin |
| 69. | 2710 Clara |
| 70. | 1309 Third |
| 71. | 2720 New Haven Ave |
| 72. | 4534 Monroe |
| 73. | 4005 Warsaw |
| 74. | 2613 Pittsburgh |
| 75. | 2747 Abbott |
| 76. | 3406 Oliver |
| 77. | 3302 Oliver |
| 78. | 3009 Drexel |
| 79. | 3401 Holton |

The closing for this final group of properties was held on June 21, 2002.

37.     In the meetings with the Nulls, Wells stated that he had "recently redone the roof and entire inside" of the house at 1703 Franklin.  In fact, no work had been done to the inside of the house for over 20 years.

38.     Wells also assured the Nulls that the house at 4510 Oliver had "good mechanicals."  In fact, the furnace had a cracked heat exchanger and needed to be replaced.

39.     After the closings, the Nulls brought various problems to Wells' attention.  Wells would simply suggest having "his repair guy" cover-up the problem through cheap repair work.

C.     FACTUAL ALLEGATIONS RELATING TO THE BROGREN MORTGAGES

40.     In early 2002, Brogren's employer filed a Chapter 11 bankruptcy petition, and Brogren was concerned that he might lose his job.  As a result, Brogren decided to look for another means of earning money in order to support himself and his family in case he did in fact lose his job.

41.     Brogren was introduced to Mark Radabaugh, a real estate broker, who in turn introduced him to Rex Wells. Wells gave Brogren a list of rental properties that Wells was willing to sell, and discussed with Brogren the opportunities available to owners of rental property. Brogren did not buy property from Wells at that time.

42.     Brogren eventually contracted with a man named "Chopra" to purchase certain rental units. In or about February of 2002, prior to consummating the deal with Chopra, Brogren was contacted by Wells. Wells told Brogren during this conversation that Chopra was laughing with others about the deal that he had made with Brogren. Wells went on to advise Brogren against buying property from Chopra. Also, during this conversation, Wells told Brogren that he was willing to assist him with his entry into the business.

43.     Brogren and Wells met again at Wells' office in approximately February of 2002, at which time Brogren was shown a new list of real estate that Wells was willing to sell. This list contained columns stating the address of the unit, the price of the unit, and the amount for which the property would appraise.  At that time, Wells told Brogren that Wells' attorney had convinced Chopra to release Brogren from the earlier agreement. Wells then assured Brogren that he would provide him with enough assistance so that Brogren's entry into the rental real estate business would be "turnkey." In fact, Wells promised Brogren that he would "hold his hand while he learned the rental business."

44.     Wells introduced Brogren to Justin Stuckey of Maximum Mortgage in mid to late February of 2002.  Shortly thereafter, at Wells' request, Justin Stuckey met with Wells and Brogren concerning the units that were to be purchased by Brogren. At this meeting, Wells and Justin Stuckey structured the proposed transaction with little input from Brogren. Brogren did not understand the proposed transaction, but agreed to it because he trusted Wells and believed

Wells' promises.

45.    Wells took Brogren to see some of the properties on the list in late February or early March.  On this trip, the men did not tour the interiors of the units because Wells indicated that he did not want to "startle the tenants."  While the men viewed the properties, Wells repeatedly indicated that the rent for the units could be increased.  As a final inducement to get Brogren to buy, Wells indicated that he would perform all necessary maintenance on any properties purchased "free of charge for one year."  Wells also agreed to rent office space to Brogren at 1616 N. Harrison Street in Fort Wayne.

46.    Brogren purchased a total of 70 properties from Wells.  The properties were purchased over the course of two months in groups of 10, 25, 25 and 10.  ABN financed Brogren's purchase of all 70 properties by purchasing the loans from Maximum Mortgage.

47.    The first closing took place on March 11, 2002, and involved Brogren's purchase of the following properties from Wells:

|     |                   |
|-----|-------------------|
| 1.  | 1021 Saint Mary   |
| 2.  | 802 High          |
| 3.  | 1217 Michigan     |
| 4.  | 1512 Saint Mary   |
| 5.  | 4425 Lafayette    |
| 6.  | 1601 Rudisill     |
| 7.  | 2926 John         |
| 8.  | 927 Dewald        |
| 9.  | 4512 Hanna        |
| 10. | 1816 Hoagland     |

48.    The second closing took place on March 29, 2002, and involved Brogren's purchase of the following properties:

|     |                    |
|-----|--------------------|
| 11. | 1419 Saint Mary's  |
| 12. | 4029 Hanna         |
| 13. | 4005 Holton        |
| 14. | 1420 Saint Mary's  |
| 15. | 1733 Meridian      |

16.   818 Wilt
17.   3119 Oliver
18.   2647 Indiana
19.   217 W. Wildwood
20.   2733 Indiana
21.   724 Guildford
22.   2336 New Haven
23.   2129 Oakley
24.   1434 Saint Mary's
25.   3102 Smith
26.   447 Violet
27.   1415 Saint Mary
28.   3210 Reed
29.   3402 Central
30.   3714 Oliver
31.   4314 Warsaw
32.   935 Burgess
33.   1102 Degroff
34.   1307 Sherman
35.   629 Second

49.     The third closing took place on April 12, 2002, and involved Brogren's purchase of the following properties:

36.   1121 Third Street
37.   925 Third Street
38.   661 High Street
39.   2025 Pauline
40.   227 Darrow
41.   4425 Hanna
42.   3717 Barr
43.   826 Belmont
44.   2429 New Haven Avenue
45.   3711 Barr
46.   1421 Third
47.   4724 Warsaw
48.   1505 Saint Mary
49.   626 Second
50.   3235 Barr
51.   1013 Franklin
52.   520 5th Street
53.   1415 Third
54.   1203 Burgess
55.   815 Jefferson

56.    2715 John Street
57.    1437 Saint Mary
58.    1715 Saint Mary
59.    1321 Sinclair
60.    1402 Third

50.    The final closing took place on April 30, 2002, and involved Brogren's purchase of the following properties:

61.    2926 Broadway
62.    1001 Cottage
63.    1516 Fourth
64.    611 Fifth Street
65.    1433 Third Street
66.    918 Pape
67.    1130 High
68.    1119 Osage
69.    1301 Sinclair
70.    1715 Richardson

51.    Brogren would review lists of potential sale properties with Wells at Wells' office shortly before each closing to determine which properties Brogren would buy. During these meetings, Wells made various representations about the good quality of the properties. Many of these representations turned out to be false.

52.    In particular, shortly before the third closing, Wells told Brogren in a meeting at Wells' office that 1203 Burgess was in good condition and had "new mechanicals." In fact, Brogren learned after the closing that the furnace needed repairs and, within approximately one month of the closing, the property was condemned.

53.    Shortly before the fourth closing, Wells represented to Brogren at a meeting in Wells' office that the house at 1001 Cottage had a "new roof." However, Brogren learned after the closing that the tenant at that property was using a bucket to catch water leaking from the roof.

54.     After purchasing the first several units, Brogren would occasionally contact Wells or Wells' staff at Alliance Property Management concerning needed maintenance at his newly acquired properties.   Wells' staff made the needed repairs, but Brogren was later charged for them. When Brogren discussed the matter with Wells, he was told that when Wells said "free of charge" he meant that Wells would not mark up the cost of maintenance.   Thereafter, Brogren discovered that he was not only being charged, but he was being charged for work which was never even performed.

55.     Brogren eventually discovered that the cost of maintaining the more than 70 rental units was more than the income generated thereby.

56.     After the last closing, Brogren continued to attempt to contact Wells about maintenance issues, but Brogren's mentor, Wells, ceased returning his calls.

D.     SUBMISSION OF LOAN APPLICATIONS, APPRAISALS AND CLOSINGS

57.     Maximum Mortgage generated loan applications on behalf of the Nulls and Brogren for the 149 properties purchased from Wells (the "Properties") and submitted them to ABN on or near their respective closing dates by way of mail and/or wire.   Much of the information included in the applications was supplied to Maximum Mortgage by Wells.   Wells knew that the information he supplied would be included in the ABN loan applications, and Wells intended for it to be passed along to ABN.

58.     The loan applications submitted by Maximum Mortgage stated that the purpose of each of the Loans was to refinance the real estate described in the loan application.   In fact, however, the purpose of each Loan was to finance the original acquisition of each of the Properties.   To support this falsified purpose, Wells supplied Justin Stuckey and Maximum Mortgage with false information concerning the year the Nulls and Brogren acquired each

Property, and the original cost of each Property, for the purpose of including such information in the applications.

59.      Wells also provided information concerning rental income being generated by the Nulls and Brogren to be included in the applications.  However, at the time the Nulls and Brogren purchased the properties, they had been receiving no rental income on many of the Properties, as they did not yet own many of the rental units.  This information was included to induce a favorable lending decision based on additional income and to give the appearance of a refinance transaction.

60.      By way of example[3], attached hereto as Exhibit "B" is a loan application pursuant to which Brogren, through Maximum Mortgage, sought a loan to finance Brogren's purchase of 1601 Rudisill from Wells.  Maximum Mortgage submitted the application to ABN on or around March 11, 2002 by way of mail and/or wire.  The loan application states that the purpose of the loan is to refinance that property, and further states that Brogren originally purchased the property in 2001.  In fact, Brogren purchased the property with the proceeds of the loan in March of 2002.  The application also shows that Brogren was generating $356.00 per month in rental income when, in fact, Brogren was not receiving any rental income at the time of the application.

61.      By way of further example, attached hereto as Exhibit "C" is a loan application pursuant to which James Null, through Maximum Mortgage, sought to finance the purchase of 4405 Monroe from Wells.  Maximum Mortgage submitted the application to ABN on or around May 23, 2002 by way of mail and/or wire.  Again, the application designates the purpose of the loan as "refinance" and shows that Null originally acquired the property in 2001.  In fact, James

---

[3] ABN is in possession of documentation relating to all of the 149 loans and will make this documentation available for the Defendants review upon request.  The documentation is not attached to the Complaint in its entirety as it is voluminous and would likely be thousands of pages in length.  The representative samples that have been provided are illustrative of the scheme.

Null purchased the property with the proceeds of the loan in May of 2002. The application lists 1604 Franklin as a property owned by Null and as generating rental income for him. Null did not own that property. The application also lists all of the properties purchased by Null at the May 23, 2002 closing, including 4405 Monroe, as generating rental income for Null. At the time of the loan application, those properties were not yet owned by Null and therefore were not generating rental income for him.

62.    Wells, Justin Stuckey and Maximum Mortgage knew the purpose of each of the loans was to finance the original acquisition of the properties described in the loan applications at the time they were prepared.

63.    Wells, Justin Stuckey and Maximum Mortgage conspired to submit the loan applications to ABN, describing the purpose of the Loans as refinancings when, in fact, the purpose of the Loans was to finance the original acquisition of the properties by Nulls and Brogren from Wells.

64.    In order to further create the appearance that the Loans to the Nulls and Brogren were refinances, Wells had the purchasers execute mortgages on the Properties in favor of Wells or one of Wells' business entities prior to the closings. Wells recorded the mortgages with the Allen County Recorder's office around the time of the closings. A portion of ABN's loan proceeds would then go to "pay off" the fictitious mortgages at closing. Wells recorded the mortgages with the intention and knowledge that ABN would rely on such information in funding the Loans.

65.    By way of example, attached hereto as Exhibit "D" are copies of mortgages granted by James Null and Brogren in favor of Alliance Property Management. On June 25, 2002 and April 10, 2002, Wells caused these mortgages to be recorded with the Allen County

Recorder. Wells created, executed, and recorded these mortgages, thereby falsifying the public records of the state of Indiana, for the purpose of inducing ABN to fund the Loans as "refinances" and "pay off" the fictitious mortgages with the loan proceeds.

66. Justin Stuckey, as an agent of Maximum Mortgage, coordinated the majority of the loan closings through Accelerated Title.

67. 139 out of the 149 transactions pursuant to which Brogren or the Nulls purchased property were closed at the offices of Accelerated Title.

68. Accelerated Title prepared all of the title work relating to the 139 transactions which were closed at its offices.

69. Below is a summary of the loans made by ABN to the Nulls setting forth the ABN loan file number, the original amounts of the loans, the current amount owed, the true market value, and the real estate securing the loans:

|    | Loan Number | Address | Original Principal Amount | Amt. Due as of 09/30/04 | True Market Value |
|----|-------------|---------|---------------------------|-------------------------|-------------------|
| 1  | 622935418 | 1043 Saint Mary Street | $ 50,400.00 | $ 61,333.31 | $ 25,000.00 |
| 2  | 622977783 | 1621 Saint Mary | $ 46,900.00 | $ 55,874.27 | $ 25,000.00 |
| 3  | 623018352 | 1614 High Street | $ 48,300.00 | $ 58,273.86 | $ 20,000.00 |
| 4  | 623019956 | 1320 High Street | $ 47,600.00 | $ 57,426.78 | $ 17,000.00 |
| 5  | 623020265 | 1129 Burgess | $ 48,300.00 | $ 58,673.33 | $ 22,400.00 |
| 6  | 623020755 | 1605 Third Street | $ 49,000.00 | $ 59,455.22 | $ 30,000.00 |
| 7  | 623021051 | 1716 Richardson | $ 46,200.00 | $ 55,625.97 | $ 16,000.00 |
| 8  | 623021164 | 612 Fourth Street | $ 49,300.00 | $ 59,459.25 | $ 30,000.00 |
| 9  | 623021368 | 3221 Clinton | $ 40,600.00 | $ 50,026.38 | $ 12,000.00 |
| 10 | 623021493 | 1021 Tennessee | $ 53,900.00 | $ 64,965.62 | $ 47,000.00 |
| 11 | 623021676 | 2137 Eby | $ 44,100.00 | $ 52,698.67 | $ 28,000.00 |
| 12 | 623233832 | 216 Second | $ 48,170.00 | $ 58,785.04 | $ 21,000.00 |
| 13 | 623233843 | 1615 St. Mary | $ 44,698.00 | $ 53,650.01 | $ 22,000.00 |
| 14 | 623233854 | 1703 Franklin | $ 44,727.00 | $ 53,843.46 | $ 17,000.00 |
| 15 | 623233865 | 2421 Thompson | $ 32,775.00 | $ 41,467.79 | $ 24,000.00 |
| 16 | 623233901 | 1402 Tecumseh | $ 44,698.00 | $ 53,807.80 | $ 44,000.00 |
| 17 | 623233912 | 1325 St. Mary's | $ 48,168.00 | $ 58,847.85 | $ 31,000.00 |
| 18 | 623233923 | 936 Rivermet | $ 44,695.00 | $ 55,343.47 | $ 35,000.00 |
| 19 | 623233934 | 511 Fifth St. | $ 44,698.00 | $ 53,883.39 | $ 30,000.00 |

|    | Loan Number | Address | Original Principal Amount | Amt. Due as of 09/30/04 | True Market Value |
|----|-------------|---------|---------------------------|-------------------------|-------------------|
| 20 | 623233945 | 528 Fifth St. | $ 39,087.00 | $ 47,249.58 | $ 32,500.00 |
| 21 | 623233967 | 1613 Kentucky | $ 39,026.00 | $ 46,868.32 | $ 39,000.00 |
| 22 | 623233978 | 1329 Third | $ 42,599.00 | $ 51,170.54 | $ 26,000.00 |
| 23 | 623233989 | 532 Fourth | $ 44,699.00 | $ 53,765.33 | $ 31,000.00 |
| 24 | 623234003 | 5220 Reed St. | $ 31,624.00 | $ 38,380.44 | $ 21,500.00 |
| 25 | 623234025 | 4329 Reed St. | $ 29,677.00 | $ 36,107.81 | $ 24,000.00 |
| 26 | 623233990 | 3711 Newport | $ 30,700.00 | $ 37,436.34 | $ 21,000.00 |
| 27 | 623234036 | 5106 Lillie | $ 32,087.00 | $ 39,042.23 | $ 12,000.00 |
| 28 | 623234058 | 2408 Priscilla | $ 37,699.00 | $ 45,614.94 | $ 13,000.00 |
| 29 | 623234069 | 1954 Fourth | $ 42,598.00 | $ 51,023.94 | $ 18,000.00 |
| 30 | 623234070 | 538 Fourth | $ 44,699.00 | $ 54,324.96 | $ 18,500.00 |
| 31 | 623234081 | 536 Fourth | $ 44,698.00 | $ 53,871.74 | $ 29,500.00 |
| 32 | 623234092 | 1035 Franklin | $ 44,669.00 | $ 53,457.08 | $ 25,000.00 |
| 33 | 623234105 | 1609 Kelly | $ 41,121.00 | $ 49,752.18 | $ 17,000.00 |
| 34 | 623234127 | 5602 Buell | $ 34,159.00 | $ 41,767.37 | $ 17,000.00 |
| 35 | 623234138 | 673 Huffman | $ 44,689.00 | $ 54,338.61 | $ 33,000.00 |
| 36 | 623234149 | 1404 Dubois | $ 18,776.00 | $ 23,732.16 | $ 23,000.00 |
| 37 | 623436519 | 415 Agnes | $ 31,500.00 | $ 38,932.93 | $ 17,000.00 |
| 38 | 623876603 | 3411 Senate | $ 37,800.00 | $ 45,825.84 | $ 17,000.00 |
| 39 | 623887398 | 718 Drexel | $ 37,756.00 | $ 46,085.77 | $ 14,000.00 |
| 40 | 623887979 | 1723 Howell | $ 48,300.00 | $ 58,195.24 | $ 24,000.00 |
| 41 | 623889458 | 2034 Phenie | $ 34,300.00 | $ 41,739.55 | $ 18,700.00 |
| 42 | 623891997 | 1328 Elm | $ 38,122.00 | $ 46,581.67 | $ 19,000.00 |
| 43 | 623892180 | 4405 Monroe | $ 32,567.00 | $ 28,264.13 | $  4,000.00 |
| 44 | 623892453 | 3801 Barr | $ 38,853.00 | $ 47,078.14 | $ 14,300.00 |
| 45 | 623892636 | 2431 Ormsby | $ 38,500.00 | $ 47,678.86 | $ 15,500.00 |
| 46 | 623892794 | 5610 Bowser | $ 45,500.00 | $ 54,677.90 | $ 28,000.00 |
| 47 | 623892943 | 3417 Oliver | $ 42,700.00 | $ 51,461.66 | $ 23,000.00 |
| 48 | 623893103 | 4001 Hanna | $ 38,500.00 | $ 46,296.10 | $ 24,500.00 |
| 49 | 623893307 | 345 W. Rudisill | $ 45,857.00 | $ 55,059.06 | $ 32,000.00 |
| 50 | 623893465 | 3206 Central | $ 33,600.00 | $ 41,741.56 | $ 14,000.00 |
| 51 | 623893513 | 3510 Weisser Park | $ 34,300.00 | $ 42,214.73 | $ 12,500.00 |
| 52 | 623893762 | 1306 Elm | $ 38,500.00 | $ 45,732.21 | $ 10,500.00 |
| 53 | 623893875 | 3804 Oliver | $ 34,300.00 | $ 41,087.30 | $ 16,500.00 |
| 54 | 623893955 | 3805 Smith | $ 32,753.00 | $ 39,204.82 | $ 11,700.00 |
| 55 | 623894091 | 4034 Reed | $ 32,607.00 | $ 39,826.45 | $ 15,000.00 |
| 56 | 624564788 | 4336 Spatz | $ 40,370.00 | $ 48,623.84 | $ 24,700.00 |
| 57 | 624596445 | 2806 Knode | $ 32,336.00 | $ 39,813.34 | $ 20,000.00 |
| 58 | 624602409 | 3611 Lillie | $ 32,761.00 | $ 39,610.75 | $ 12,000.00 |
| 59 | 624602637 | 3806 S. Anthony | $ 39,800.00 | $ 48,140.28 | $ 14,000.00 |
| 60 | 624612899 | 1515 Rudisill | $ 43,295.00 | $ 51,486.17 | $ 11,000.00 |
| 61 | 624613322 | 4637 Spatz | $ 40,574.00 | $ 48,452.25 | $ 10,000.00 |

| | Loan Number | Address | Original Principal Amount | Amt. Due as of 09/30/04 | True Market Value |
|---|---|---|---|---|---|
| 62 | 624613457 | 4501 Bowser | $ 42,552.00 | $ 50,758.21 | $ 11,000.00 |
| 63 | 624613549 | 4510 Oliver | $ 36,881.00 | $ 44,027.15 | $ 11,000.00 |
| 64 | 624613631 | 3925 Robinwood | $ 31,102.00 | $ 37,679.08 | $ 9,000.00 |
| 65 | 624613743 | 3305 Hanna | $ 40,421.00 | $ 49,168.62 | $ 17,000.00 |
| 66 | 624614880 | 543 Fifth | $ 43,488.00 | $ 52,349.53 | $ 28,000.00 |
| 67 | 624615197 | 1012 St. Mary's | $ 49,309.00 | $ 58,663.39 | $ 27,000.00 |
| 68 | 624615313 | 1025 Franklin | $ 43,641.00 | $ 52,009.93 | $ 27,000.00 |
| 69 | 624615698 | 2710 Clara | $ 49,188.00 | $ 58,408.32 | $ 45,500.00 |
| 70 | 624616267 | 1309 Third | $ 52,830.00 | $ 63,030.44 | $ 16,000.00 |
| 71 | 624617279 | 2720 New Haven Avenue | $ 32,753.00 | $ 39,876.63 | $ 12,500.00 |
| 72 | 624617689 | 4534 Monroe | $ 32,933.00 | $ 40,186.41 | $ 25,500.00 |
| 73 | 624617805 | 4005 Warsaw | $ 38,400.00 | $ 46,000.19 | $ 27,000.00 |
| 74 | 624617974 | 2613 Pittsburgh | $ 32,769.00 | $ 40,550.73 | $ 17,250.00 |
| 75 | 624618123 | 2747 Abbott | $ 38,207.00 | $ 45,990.81 | $ 11,000.00 |
| 76 | 624618316 | 3406 Oliver | $ 39,928.00 | $ 48,692.68 | $ 14,000.00 |
| 77 | 624618430 | 3302 Oliver | $ 40,606.00 | $ 49,041.47 | $ 17,000.00 |
| 78 | 624618862 | 3009 Drexel | $ 32,609.00 | $ 39,255.37 | $ 22,000.00 |
| 79 | 624613834 | 3401 Holton | $ 32,874.00 | $ 40,283.64 | $ 10,500.00 |

70.    Below is a summary of the loans made by ABN to Brogren setting forth the ABN loan file number, the original amounts of the loans, and the current amount owed, the true market value, and the real estate securing the loans:

| | Loan Number | Address | Original Principal Amount | Amt. Due as of 09/30/04 | True Market Value |
|---|---|---|---|---|---|
| 1 | 621839168 | 1021 Saint Mary | $ 43,400.00 | $ 55,998.63 | $ 8,000.00 |
| 2 | 621930251 | 802 High | $ 40,600.00 | $ 50,214.42 | $ 17,000.00 |
| 3 | 622607148 | 1419 Saint Mary's | $ 42,700.00 | $ 54,747.38 | $ 28,000.00 |
| 4 | 622717506 | 4029 Hanna | $ 28,300.00 | $ 36,898.02 | $ 25,000.00 |
| 5 | 622718197 | 4005 Holton | $ 20,600.00 | $ 26,537.97 | $ 11,500.00 |
| 6 | 622720260 | 1420 Saint Mary's | $ 28,300.00 | $ 36,630.61 | $ 18,100.00 |
| 7 | 622720497 | 1733 Meridian | $ 40,200.00 | $ 53,840.05 | $ 21,500.00 |
| 8 | 622721147 | 818 Wilt | $ 31,820.00 | $ 40,577.80 | $ 19,500.00 |
| 9 | 622721283 | 3119 Oliver | $ 26,200.00 | $ 32,876.17 | $ 10,000.00 |
| 10 | 622721513 | 2647 Indiana | $ 29,700.00 | $ 39,127.47 | $ 15,000.00 |
| 11 | 622721784 | 217 W. Wildwood | $ 32,500.00 | $ 40,193.70 | $ 15,600.00 |
| 12 | 622721864 | 2733 Indiana | $ 22,000.00 | $ 29,429.65 | $ 18,500.00 |

|    | Loan Number | Address | Original Principal Amount | Amt. Due as of 09/30/04 | True Market Value |
|----|-------------|---------|---------------------------|-------------------------|-------------------|
| 13 | 622722126 | 724 Guildford | $ 36,700.00 | $ 46,283.52 | $ 11,500.00 |
| 14 | 622722967 | 2336 New Haven | $ 24,100.00 | $ 31,711.89 | $ 13,750.00 |
| 15 | 622723401 | 2129 Oakley | $ 39,400.00 | $ 48,654.00 | $ 11,200.00 |
| 16 | 622723720 | 1434 Saint Mary's | $ 42,700.00 | $ 53,510.15 | $ 18,500.00 |
| 17 | 622723888 | 3102 Smith | $ 26,900.00 | $ 35,558.87 | $ 13,500.00 |
| 18 | 622725367 | 447 Violet | $ 36,700.00 | $ 46,605.71 | $ 15,000.00 |
| 19 | 622962434 | 1121 Third Street | $ 44,800.00 | $ 56,137.27 | $ 24,000.00 |
| 20 | 622975930 | 925 Third Street | $ 44,800.00 | $ 56,855.53 | $ 22,500.00 |
| 21 | 622976010 | 661 High Street | $ 46,900.00 | $ 59,474.95 | $ 22,900.00 |
| 22 | 622976054 | 2025 Pauline | $ 29,400.00 | $ 38,177.90 | $ 30,850.00 |
| 23 | 622976123 | 227 Darrow | $ 31,500.00 | $ 39,932.29 | $ 15,500.00 |
| 24 | 622976134 | 4425 Hanna | $ 29,400.00 | $ 36,887.28 | $ 15,250.00 |
| 25 | 622976189 | 3717 Barr | $ 28,700.00 | $ 36,275.37 | $ 12,000.00 |
| 26 | 622976190 | 826 Belmont | $ 28,000.00 | $ 35,194.81 | $ 18,000.00 |
| 27 | 622976214 | 2429 New Haven Avenue | $ 30,100.00 | $ 39,140.67 | $  5,000.00 |
| 28 | 622976225 | 3711 Barr | $ 28,700.00 | $ 36,511.59 | $ 10,000.00 |
| 29 | 622976258 | 1421 Third | $ 40,600.00 | $ 50,575.90 | $ 39,000.00 |
| 30 | 622976270 | 4724 Warsaw | $ 29,400.00 | $ 37,554.44 | $ 17,400.00 |
| 31 | 622976281 | 1505 Saint Mary | $ 39,900.00 | $ 49,908.42 | $ 25,350.00 |
| 32 | 622976316 | 626 Second | $ 34,300.00 | $ 43,738.10 | $ 28,650.00 |
| 33 | 622976349 | 3235 Barr | $ 25,200.00 | $ 32,849.20 | $  8,000.00 |
| 34 | 622976383 | 1013 Franklin | $ 32,900.00 | $ 41,858.67 | $ 13,900.00 |
| 35 | 622976394 | 520 5th Street | $ 44,800.00 | $ 56,004.65 | $ 13,900.00 |
| 36 | 622977670 | 1415 Third | $ 44,800.00 | $ 55,213.08 | $ 23,500.00 |
| 37 | 623015213 | 1203 Burgess | $ 49,000.00 | $ 62,276.95 | $ 19,900.00 |
| 38 | 623017442 | 815 Jefferson | $ 38,500.00 | $ 48,659.85 | $ 22,000.00 |
| 39 | 623018012 | 2715 John Street | $ 26,600.00 | $ 34,979.10 | $ 18,000.00 |
| 40 | 623018249 | 1437 Saint Mary | $ 35,000.00 | $ 43,621.13 | $ 28,000.00 |
| 41 | 623018487 | 1715 Saint Mary | $ 37,800.00 | $ 48,750.02 | $ 17,500.00 |
| 42 | 623018637 | 1321 Sinclair | $ 28,700.00 | $ 35,669.50 | $ 18,900.00 |
| 43 | 623019057 | 1402 Third | $ 44,800.00 | $ 54,595.50 | $  9,300.00 |
| 44 | 623389761 | 2926 Broadway | $ 36,000.00 | $ 45,332.54 | $ 22,100.00 |
| 45 | 623399616 | 1001 Cottage | $ 30,100.00 | $ 39,323.81 | $ 25,500.00 |
| 46 | 623399650 | 1516 Fourth | $ 33,100.00 | $ 42,697.51 | $ 19,000.00 |
| 47 | 623399672 | 611 Fifth Street | $ 33,100.00 | $ 41,788.71 | $ 34,900.00 |
| 48 | 623399694 | 1433 Third Street | $ 33,100.00 | $ 41,687.51 | $ 26,500.00 |
| 49 | 623403246 | 918 Pape | $ 33,100.00 | $ 42,080.75 | $ 31,700.00 |
| 50 | 623403736 | 1130 High | $ 33,100.00 | $ 43,329.88 | $ 14,800.00 |
| 51 | 623404555 | 1119 Osage | $ 33,100.00 | $ 41,288.53 | $ 19,200.00 |
| 52 | 623404680 | 1301 Sinclair | $ 33,100.00 | $ 42,913.87 | $ 22,000.00 |
| 53 | 623404884 | 1715 Richardson | $ 33,100.00 | $ 41,679.75 | $ 21,150.00 |
| 54 | 621841845 | 1217 Michigan | $ 36,400.00 | $ 46,099.78 | $ 21,000.00 |

|    | Loan Number | Address | Original Principal Amount | Amt. Due as of 09/30/04 | True Market Value |
|----|-------------|---------|---------------------------|-------------------------|-------------------|
| 55 | 621886805 | 1512 Saint Mary | $ 46,900.00 | $ 57,924.53 | $ 15,000.00 |
| 56 | 621886872 | 4425 Lafayette | $ 34,300.00 | $ 43,764.27 | $ 17,500.00 |
| 57 | 621888512 | 1601 Rudisill | $ 42,000.00 | $ 52,315.17 | $ 48,000.00 |
| 58 | 621889056 | 2926 John Street | $ 32,200.00 | $ 41,350.44 | $ 11,000.00 |
| 59 | 621889591 | 927 Dewald | $ 42,000.00 | $ 53,351.71 | $ 20,000.00 |
| 60 | 621929986 | 4512 Hanna | $ 38,850.00 | $ 49,559.36 | $ 15,000.00 |
| 61 | 621930364 | 1816 Hoagland | $ 30,800.00 | $ 39,295.00 | $  9,000.00 |
| 62 | 622719713 | 1415 Saint Mary's | $ 36,700.00 | $ 47,099.14 | $ 29,500.00 |
| 63 | 622720486 | 3210 Reed | $ 22,000.00 | $ 28,824.64 | $ 11,900.00 |
| 64 | 622721250 | 3402 Central | $ 24,600.00 | $ 31,424.74 | $ 20,000.00 |
| 65 | 622723285 | 3714 Oliver | $ 26,200.00 | $ 34,402.82 | $ 10,500.00 |
| 66 | 622724527 | 4314 Warsaw | $ 20,400.00 | $ 26,276.46 | $ 11,900.00 |
| 67 | 622725551 | 935 Burgess | $ 37,300.00 | $ 47,596.63 | $ 19,200.00 |
| 68 | 622726471 | 1102 Degroff | $ 28,100.00 | $ 36,523.63 | $ 20,700.00 |
| 69 | 622727165 | 1307 Sherman | $ 44,400.00 | $ 55,294.11 | $ 32,000.00 |
| 70 | 622728360 | 629 Second Street | $ 38,800.00 | $ 48,180.24 | $ 16,400.00 |

71.    Accelerated Title is an agent of Stewart Title for purposes of closing real estate transactions and providing title insurance.

72.    Accelerated Title failed to close the Loans and prepare the title work in a commercially reasonable manner and in accordance with community standards, and according to instructions provided by ABN.

73.    Accelerated Title knew or should have known that the Loans were not refinance loans. In regard to some of the Properties, title was first acquired by the borrowers after the day of, or the day before the closing of the supposed refinance loan. In regard to some of the Properties, title commitments included exceptions for mortgages that had not yet been recorded and were not to be recorded until after the loan closing. In regard to a few of the Properties, title was held by both the borrower and Wells (or one of Wells' entities) *simultaneously*. In regard to some of the Properties, payoff letters from Bank One to Accelerated Title referenced Wells or his business entities as the mortgagor. Each of the foregoing facts, among others, should have put

Accelerated Title on notice that the loans were not refinance loans.

74.    For example, attached as Exhibit "E" is documentation related to James Ryan Null's acquisition of 3806 S. Anthony.  The closing for this property occurred on June 21, 2002.  The title commitment has an effective date of April 26, 2002.  The commitment states that title "is at the effective date hereof vested in James Ryan Null."  In fact, the property was then owned by Indiana Lawrence Bank.  It was then acquired by Mark Ludwig (a business associate of Wells) on June 7, 2002.  It was then acquired by Eilatan Financial, Inc. (a corporation owned by Wells) on June 20, 2002.  It was then immediately conveyed to Mr. Null on June 20, 2002, the day before the closing.  Accordingly, Accelerated Title misrepresented the status of the title in its commitment to ABN.

75.    Further, with respect to James Ryan Null's acquisition of 3806 S. Anthony, the requirements set forth in the commitment from Accelerated Title include the release of a mortgage "from Alliance Property Management to James R. Null, dated June 19, 2002, recorded June 25, 2002."    In fact, that mortgage was from James R. Null to Alliance Property Management, instead of the other way around.  Further, Accelerated's commitment lists as an exception a document which was not recorded until two months after the effective date.  More importantly, the commitment makes reference to a document recorded four days after the loan closing.  Accelerated Title prepared the commitment sometime after June 25, 2002, even though it represented to ABN that the transaction closed on June 21, 2002.  Accelerated Title hid this fact by informing ABN that Maximum Mortgage would send the paperwork at a later date.  Accelerated Title closed the transaction, but did not attend to the release of the Alliance Mortgage.  That mortgage was not released until May 12, 2003.

76.    Each of the properties purchased by the Nulls and Brogren were appraised by

Chevalier (the "Appraisals") at the direction of Maximum Mortgage and Wells.    Chevalier purposefully valued the properties greatly in excess of fair market value.  Chevalier did not use commercially reasonable techniques in conducting the Appraisals.

77.    In some of the Appraisals, Chavalier used a "comparable" which was previously sold by Wells himself to either the Nulls or Brogren.  In some of the Appraisals, the transaction constituting the comparable just closed one day prior to the closing of the subject of the appraisal.  Chevalier performed some of the Appraisals prior to Null and Brogren acquiring title to the real estate, but indicated in the appraisal that Null or Brogren owned the property.  In some of the Appraisals, Chevalier used property which was acquired at the same time as the subject real estate used as a comparable.

78.    By way of example, attached hereto as Exhibit "F" is a copy of an appraisal conducted by Chevalier on 3806 South Anthony.  The appraisal is dated June 14, 2002.  The appraisal shows "Null" as the owner of the property and indicates that the appraisal is being conducted in connection with a refinance transaction.  In fact, James Ryan Null was not the record owner of the property until June 20, 2002 – one day prior to the closing.

79.    Further, the rental comparisons used by Chevalier in the 3806 South Anthony appraisal are all properties recently acquired by the Nulls as a part of the fraud scheme.  The rental value on these properties is said to have been acquired by the "owner."  However, having just recently purchased the properties, the Nulls would not have had reliable information in this regard.    More likely, the values were obtained from Wells.    Accordingly, the information contained in Chevalier's appraisal was knowingly unreliable and fictitious.

80.    Further, Chevalier's 3806 South Anthony appraisal states that there are no recent prior sales of the property.    In fact, the property was acquired by Mark Ludwig (a business

associate of Wells) from Indiana Lawrence Bank on June 7, 2002; just seven days before the date of the appraisal.

81.    Chevalier over-valued the properties, and otherwise included false information therein, knowing and intending for the Nulls, Brogren and ABN to rely on the falsified Appraisals. Chevalier prepared the Appraisal's for the purpose of being submitted to, and relied upon by, the Nulls, Brogren, and ABN.

82.    Chevalier was an appraiser in training at the time of the first transactions and was working for Appraisal Source under the supervision of appraiser Rollins. Chevalier obtained his permanent license in April of 2002. After obtaining his license, Chevalier performed the appraisals and prepared the reports as an agent of an entity he owns, AC Appraisal

83.    In addition to Chevalier, Rollins and Appraisal Source are responsible for those appraisals that Chevalier performed while employed by Appraisal Source, under Rollins' supervision, and prior to being licensed.

84.    In addition to Chevalier personally, Chevalier's company, AC Appraisal, is responsible for those appraisals that Chevalier performed after he obtained his license, left Appraisal Source, and created AC Appraisal.

85.    In addition to appraising each of the Properties, Chevalier personally assured Brogren that Wells was giving the Brogrens "a great deal" in connection with the units they were buying.

86.    At present, each of the 149 mortgages are in default.

87.    The original principal amount of the Loans was a sum in excess of $5,500,000.00. Currently, the outstanding amounts due and owing under the Loans is a sum in excess of $6,800,000.00.

88.     ABN estimates that the Properties securing the Loans have an aggregate value of less than $3,100,000.00.

89.     ABN has incurred a substantial loss, the amount still to be finally calculated, as a result of buying and funding the Loans.

90.     Wells knowingly represented to both the Nulls and Brogren that the Properties were worth substantially more than their actual fair market values.

91.     Wells misrepresented the condition of the Properties to the Nulls and Brogren.

92.     Wells, through Maximum Mortgage, misrepresented to ABN the status of title to the properties and the nature of the Loan transactions.

93.     Chevalier, as an agent of both Appraisal Source and AC Appraisal, knowingly appraised the Properties far in excess of their fair market value and included false information in the Appraisals.

94.     Rollins either knowingly or recklessly participated in the fraudulent Appraisals conducted under his supervision.

95.     Wells knowingly provided the inflated Appraisals performed by Chevalier to the Nulls and Brogren.

96.     The Nulls and Brogren relied upon the misrepresentations of Wells and the inflated appraisals and were thereby induced to purchase the subject Properties from Wells.

97.     The misstatements made to the Nulls and Brogren were relayed to ABN through Maximum Mortgage to induce it to make mortgage loans to the Nulls and Brogren.

98.     Maximum Mortgage and Wells represented to ABN the purpose of the mortgage loans as refinance loans instead of original purchase money loans.

99.     Accelerated Title either misrepresented the status of the titles to the various

Properties and/or were grossly negligent in its preparation of the title work.

100.    Stewart Title agreed to reimburse ABN for losses arising out of Accelerated Title's fraud or dishonesty in handling ABN's funds or documents in addition to losses arising from Accelerated Title's failure to comply with ABN's closing instructions..

III.    CLAIMS

## COUNT I

### BREACH OF CONTRACT CLAIMS

101.    ABN hereby incorporates by reference the allegations contained in all preceding paragraphs of this Amended Complaint.

a.    Maximum Mortgage

102.    Under Section 3 of the Lending Agreement, Maximum Mortgage represented and warranted to ABN, and agreed with ABN that, among other things, at the time ABN funded each of the Loans in question:

i.    Each Mortgage Loan is valid and, to the best of [Maximum Mortgage's] knowledge, secured by a valid first lien on the Mortgaged Property . . .

ii.    Neither the Borrower not the Mortgagor have any set-offs, counter-claims or defenses to the Promissory Note or the Mortgage arising from the acts and/or omissions of [Maximum Mortgage] in the origination of Mortgage Loan . . .

iii.    All documents or instruments submitted by [Maximum Mortgage] in connection with a Mortgage Loan are, in every respect, valid and genuine, being what on their face they purport to be, and all information (credit or otherwise) submitted in connection with such Mortgage Loan packages is true and accurate.

iv.    [Maximum Mortgage] has no knowledge of any circumstances or conditions with respect to any Mortgage Loan, Mortgaged Property, the Borrower, the Mortgagor, or Mortgagor's or Borrower's credit standing that can be reasonably expected to cause private institutional investors,

FNMA, FHLMC, or GNMA to regard the loan as an unacceptable investment, cause the Mortgage Loan to become delinquent or adversely affect the value or marketability of the Mortgage Loan.

See Exhibit "A".

103.    In fact, at the time ABN funded the Loans, the Loans were not refinance loans as represented, but were instead original purchase money loans. This fact would cause investors to "regard the loan(s) as an unacceptable investment" under the stated terms and "adversely effect the value or marketability of the [Loans]." Moreover, some of the Loans were not secured by a "valid first lien." The information submitted with the Loans was not "true and accurate."

104.    The appraisals relied upon by ABN in determining whether it would fund the Loans were inflated by Chevalier at the direction of Wells and Maximum Mortgage. This fact would cause investors to "regard the loan(s) as an unacceptable investment" and "adversely affect the value or marketability of the [Loans]." The information submitted with the Loans was not "true and accurate."

105.    Maximum Mortgage breached the Lending Agreement in numerous ways.

106.    As a result of Maximum Mortgages' breach of the Lending Agreement, ABN has been damaged.

b.    Accelerated Title.

107.    Accelerated Title was ABN's fiduciary, retained to close the loans referenced herein in accordance with the instructions provided by ABN. As such, Accelerated Title was bound by an implied contract to deal with ABN in absolute good faith.

108.    At the time of the closings, Accelerated Title had actual or constructive knowledge that the Loans were refinance loans and concealed the fact that the Loans were original purchase money loans.

- 27 -

109.    Accelerated Title breached the implied contract and failed to follow ABN's closing instructions by failing to notify ABN of the frauds and participating in their furtherance.

110.    Accelerated Title benefited from its breach, while ABN was harmed by it.

c.    Stewart Title.

111.    In a letter dated July 8, 1999, from Stewart Title to ABN, Stewart Title promised to reimburse ABN for actual loss arising out of: 1) the failure of a Stewart Title agent to comply with ABN's written closing instructions, or 2) fraud or dishonesty on the part of a Stewart Title agent. A copy of Stewart Title's letter agreement is attached hereto as Exhibit "G".

112.    Accelerated Title is an agent of Stewart Title.

113.    Accelerated Title dishonestly and fraudulently represented that the Loans were refinance loans and concealed the fact that the Loans were original purchase money loans.

114.    ABN was damaged as a result of the fraudulent and dishonest conduct of Accelerated Title.

115.    Pursuant to the July 8, 1999 letter, Stewart Title is contractually responsible for the dishonest and fraudulent acts of Accelerated Title.

d.    Chevalier, Rollins, Appraisal Source, and AC Appraisal.

116.    Chevalier knew that ABN would rely upon the false and negligent appraisals, which created a contract between ABN and Chevalier, obligating Chevalier to conduct the appraisals in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP").

117.    Chevalier failed to conduct the appraisals in accordance with USPAP.

118.    Rollins, Appraisal Source, and AC Appraisal, as principals and supervisors of Chevalier, are also bound by USPAP and the contract between Chevalier and ABN.

WHEREFORE, ABN prays for judgment against each Maximum Mortgage, Accelerated Title, Stewart Title, Chevalier, Rollins, Appraisal Source, and AC Appraisal in an amount that will fully and adequately compensate ABN for its losses incurred, the costs of this action, and all other proper relief.

COUNT II

FRAUD

119.    ABN hereby incorporates by reference the allegations contained in all preceding paragraphs of this Amended Complaint.

a.    Maximum Mortgage

120.    Maximum Mortgage knowingly misrepresented to ABN that the Loans were refinance loans as opposed to original purchase money loans.

121.    Maximum Mortgage knowingly misrepresented to ABN that the Appraisals were performed in a commercially reasonable manner and generally reflected the fair market value of the Properties.

122.    ABN reasonably relied upon these material misrepresentations and funded the loans to its detriment.

123.    Maximum Mortgage's conduct in this regard constituted fraudulent misrepresentation.

b.    Chevalier

124.    Chevalier knowingly and intentionally misrepresented the fair market values of, and the status of title to, the Properties to the Nulls, Brogren and ABN through the preparation of false appraisals.

125.    ABN reasonably relied upon these material misrepresentations and funded the loans to its detriment.

126.    Chevalier's conduct in this regard constituted fraudulent misrepresentation.

c.    Accelerated Title

127.    Accelerated Title knowingly misrepresented the status of the titles of 139 of the Properties to ABN, and closed 139 loans knowing that ABN believed that the Loans were to refinance property already owned by Nulls or Brogren when, in fact, the purpose of the Loans was to finance the original acquisition of the Properties.

128.    ABN relied upon these material misrepresentations and funded the loans to its detriment.

129.    Accelerated Title's conduct in this regard constituted fraudulent misrepresentation.

d.    Stewart Title.

130.    Accelerated Title is an agent of Stewart Title.

131.    Accelerated Title made material misrepresentations to ABN that induced ABN to fund the Loans to its detriment.

132.    Stewart Title is responsible for the dishonest and fraudulent acts of its agent Accelerated Title.

e.    Wells

133.    Wells knowingly misrepresented to both the Nulls and Brogren: the condition of the Properties; the likely appraisal value of the Properties; the actual appraised value of the Properties; the current profitability of the Properties; the feasibility of increasing the rental

income from the Properties; the likelihood of selling the Properties to the current tenants; and the amount of maintenance required in relation to the Properties.

134.    Wells also knowingly misrepresented the status of ownership of the Properties to ABN, both through supplying false information to Maximum Mortgage for use in the loan applications and by executing and recording false mortgages on the Properties.

135.    ABN relied upon these material misrepresentations and funded the loans to its detriment.

136.    Wells' conduct in this regard constituted fraudulent misrepresentation.

WHEREFORE, ABN prays for judgment against each Maximum Mortgage, Chevalier, Accelerated Title, Stewart Title, and Wells in an amount that will fully and adequately compensate ABN for its losses incurred, the costs of this action, and all other proper relief.

COUNT III

CONSTRUCTIVE FRAUD

137.    ABN hereby incorporates by reference the allegations contained in all preceding paragraphs of this Amended Complaint.

a.    Accelerated Title

138.    Accelerated Title knew that inaccurate, incorrect, incomplete, false, and/or fraudulent information was being used to obtain the Loans.

139.    Accelerated Title owed ABN a duty to disclose that inaccurate, incorrect, incomplete, false, and/or fraudulent information was being used to obtain the Loans.

140.    Accelerated Title failed to disclose as much to ABN prior to or at the time of the closings and therefore breached its obligations to ABN.

141.    The failure of Accelerated Title to disclose such information to ABN prior to or at

the time of closing constitutes constructive fraud.

142.   As a result of the constructive fraud of Accelerated Title, ABN has been damaged.

### b.   Stewart Title.

143.   Accelerated Title is an agent of Stewart Title.

144.   The failure of Accelerated Title to disclose that inaccurate, incorrect, incomplete, false, and/or fraudulent information was being used to obtain the Loans constituted constructive fraud.

145.   Stewart Title is responsible for the constructive fraud of its agent Accelerated Title.

### c.   Maximum Mortgage

146.   Maximum Mortgage knew that inaccurate, incorrect, incomplete, false, and/or fraudulent information would be used to obtain the Loans.

147.   Maximum Mortgage owed ABN a duty to disclose that inaccurate, incorrect, incomplete, false, and/or fraudulent information would be used to obtain the Loans.

148.   Maximum Mortgage failed to disclose as much to ABN prior to or at the time of the closings and therefore breached their obligations to ABN.

149.   The failure of Maximum Mortgage to disclose such information to ABN prior to or at the time of closing constitutes constructive fraud.

150.   As a result of the constructive fraud of Maximum Mortgage, ABN has been damaged.

WHEREFORE, ABN prays for judgment against Accelerated Title, Stewart Title, and Maximum Mortgage in an amount that will fully and adequately compensate ABN for its losses incurred, the costs of this action, and all other proper relief.

COUNT IV

NEGLIGENCE CLAIM

151.    ABN hereby incorporates by reference the allegations contained in all preceding paragraphs of this Amended Complaint.

      a.      Accelerated Title

152.    Accelerated Title owed a duty to ABN to act with reasonable care and in accordance with reasonable commercial practices and procedures in closing the Loans.

153.    Accelerated Title and its employees and agents involved in closing the Loans knew, or should have known, that certain pertinent and relevant information that was material to the loan closing process and the funding of the Loans by ABN was either incorrect, false, and/or fraudulent information and/or not in accordance with reasonable commercial practices.

154.    Accelerated Title owed a duty to report the incorrect, false, and/or fraudulent information to ABN and to refrain from closing the Loans or disbursing loan proceeds until such information was reviewed by ABN.

155.    Accelerated Title breached its duty of reasonable care to ABN in closing, and disbursing proceeds of, the Loans.

      b.      Stewart Title

156.    Accelerated Title is an agent of Stewart Title.

157.    Accelerated Title breached its duty of reasonable care to ABN in closing, and disbursing proceeds of, the Loans.

- 33 -

158.    Stewart Title is responsible for the negligence of its agent Accelerated Title.

c.    Chevalier, Rollins, Appraisal Source, and AC Appraisal.

159.    Chevalier owed ABN a duty to conduct the appraisals in a commercially reasonable manner and in accordance with USPAP and the community standards.

160.    Chevalier failed to conduct the appraisals in a commercially reasonable manner and in accordance with USPAP and the community standards.

161.    Rollins, Appraisal Source, and AC Appraisal, as principals and supervisors of Chevalier are also liable for Chevalier's negligent conduct in preparing the appraisals.

WHEREFORE, ABN prays for judgment against Accelerated Title, Stewart Title, Chevalier, Rollins, Appraisal Source, and AC Appraisal in an amount that will fully and adequately compensate ABN for its losses incurred as a result of such negligence, the costs of this action, and all other proper relief.

COUNT V

BREACH OF FIDUCIARY DUTY

162.    ABN hereby incorporates by reference the allegations contained in all preceding paragraphs of this Amended Complaint.

a.    Accelerated Title

163.    Accelerated Title owed a fiduciary duty to ABN with regard to the closing of the Loans and disbursement of any proceeds.

164.    Accelerated Title breached its fiduciary duty to ABN with regard to the closing of the Loans and disbursement of any proceeds.

165.    As a result of the breach of fiduciary duty, ABN has been damaged.

b.    Stewart Title

166.    Accelerated Title is an agent of Stewart Title.

167.    Accelerated Title breached its fiduciary duty to ABN with regard to the closing of the Loans and disbursement of any proceeds.

168.    As a result of the agency relationship between Stewart Title and Accelerated Title, Stewart Title is responsible for Accelerated Title's breach of fiduciary duty in regard to ABN.

WHEREFORE, ABN prays for judgment against Accelerated Title and Stewart Title in an amount that will fully and adequately compensate ABN for its losses incurred as a result of such breach, the costs of this action, and all other proper relief.

<u>COUNT VI</u>

<u>UNJUST ENRICHMENT</u>

169.    ABN hereby incorporates by reference its allegations in all preceding paragraphs of this Amended Complaint.

a.    <u>Wells</u>

170.    Due to his misrepresentations and his control and direction of the over all enterprise, Wells was able to ensure that ABN would fund the mortgages enabling the borrowers to purchase his Properties at inflated values.

171.    Wells used the resulting profits to purchase an apartment complex known as the Gardenview Apartments.

172.    ABN is entitled to place the apartment complex in a constructive trust on the grounds of unjust enrichment.

WHEREFORE, ABN prays for judgment against Wells in an amount that will fully and adequately compensate ABN for its losses incurred, the costs of this action, and all other proper relief.

## COUNT VII

### CIVIL CONSPIRACY.

173.    ABN hereby incorporates by reference its allegations in all preceding paragraphs of this Amended Complaint.

174.    Wells, Maximum Mortgage, Chevalier, Rollins, AC Appraisal, Appraisal Source, and Accelerated Title, acted together in a concerted effort to defraud ABN through their respective roles in the fraud and schemes detailed above.

175.    ABN has suffered damages as a result of this concerted and unlawful activity.

176.    These actions constitute a civil conspiracy.

WHEREFORE, ABN prays for judgment against each Wells, Maximum Mortgage, Chevalier, Rollins, AC Appraisal, Appraisal Source, and Accelerated Title in an amount that will fully and adequately compensate ABN for its losses incurred, the costs of this action, and all other proper relief.

## COUNT VIII

### DEFRAUDING A FINANCIAL INSTITUTION (IND. CODE § 35-43-5-8).

177.    ABN hereby incorporates by reference the allegations contained in all preceding paragraphs of this Amended Complaint.

178.    ABN is a wholly owned subsidiary of Standard Federal Bank and is a state or federally chartered or federally insured financial institution

179.    Wells, Maximum Mortgage, Chevalier, Rollins, AC Appraisal, Appraisal Source

and Accelerated Title knowingly executed multiple schemes to obtain money from ABN through false pretenses by participating in the loan transactions described in this Amended Complaint.

180.    ABN suffered pecuniary loss as a result of the execution, or attempted execution, of the schemes.

181.    ABN is entitled to bring a civil action to recover treble damages, costs and fees for such pecuniary loss pursuant to Ind. Code § 34-24-3-1.

WHEREFORE, ABN respectfully prays that a judgment be entered in its favor against each Wells, Maximum Mortgage, Chevalier, Rollins, AC Appraisal, Appraisal Source and Accelerated Title for damages in an amount equal to: the pecuniary loss suffered, treble damages, reasonable attorney's fees, expenses and costs as permitted by statute, and for all other proper relief.

COUNT IX

DECEPTION (IND. CODE § 35-43-5-3).

182.    ABN hereby incorporates by reference the allegations contained in all preceding paragraphs of this Amended Complaint.

183.    Wells, Maximum Mortgage, Chevalier, Rollins, AC Appraisal, Appraisal Source, and Accelerated Title misrepresented the fair market value of the property, the nature of the current ownership of the property, and the fact that the loans were being closed pursuant to commercially reasonable standards with an intent to defraud.

184.    Wells, Maximum Mortgage, Chevalier, Rollins, AC Appraisal, Appraisal Source, and Accelerated Title all knowingly provided, endorsed, or supported false loan applications, false appraisals and other supporting loan documentation to induce ABN to fund the Loans.

185.    Wells, Maximum Mortgage, Chevalier, Rollins, AC Appraisal, Appraisal Source,

and Accelerated Title obtained substantial monies through misrepresenting the quality of the Properties by:

        a.      Knowingly providing incorrect, incomplete, false, and/or fraudulent real estate appraisals;

        b.      Preparing false and/or fraudulent loan applications and supporting loan documentation including job history and income; and

        c.      Preparing and endorsing incorrect, improper, false, and/or fraudulent loan closing documents, including HUD-1 statements.

186.    Wells, Maximum Mortgage, Chevalier, Rollins, AC Appraisal, Appraisal Source, and Accelerated Title received substantial monies from fraudulently procuring each of the Loans, and caused ABN to suffer pecuniary loss.

187.    ABN is entitled to bring a civil action to recover treble damages, costs, and fees for its pecuniary loss pursuant to Ind. Code § 34-24-3-1.

WHEREFORE, ABN prays for judgment against each Wells, Maximum Mortgage, Chevalier, Rollins, AC Appraisal, Appraisal Source, and Accelerated Title in an amount that will fully and adequately compensate ABN for its losses, for treble damages, and attorney's fees pursuant to the statute, the costs of this action and all other proper relief.

COUNT X

CRIMINAL MISCHIEF (IND. CODE § 35-43-1-2).

188.    ABN hereby incorporates by reference the allegations contained in all preceding paragraphs of this Amended Complaint.

189.    Wells, Maximum Mortgage, Accelerated Title Company, Chevalier, Appraisal Source, Rollins, and AC Appraisal knowingly and intentionally caused ABN to suffer pecuniary

loss through the deceptive and fraudulent schemes described above.

190.    Such conduct constitutes criminal mischief pursuant to Ind. Code § 35-43-1-2 and entitles ABN to bring a civil action for treble damages pursuant to Ind. Code § 34-24-3-1.

WHEREFORE, ABN respectfully prays that a judgment be entered in its favor against each Wells, Maximum Mortgage, Accelerated Title Company, Chevalier, Appraisal Source, Rollins, and AC Appraisal for damages in an amount equal to: the pecuniary loss suffered, treble damages, reasonable attorneys' fees, expenses and costs as permitted by statute, and for all other proper relief.

COUNT XI

PIERCING THE "CORPORATE VEIL" AS TO

ACCELERATED TITLE AND MAXIMUM MORTGAGE

191.    ABN hereby incorporates by reference its allegations in all preceding paragraphs of this Amended Complaint.

192.    James Pappas had knowledge of, and/or reckless disregard for, the fraudulent actions carried out in the name of Accelerated Title.

193.    James Pappas used Accelerated Title to promote the fraud, injustice, and illegal activities discussed above for his personal benefit.

194.    Accelerated Title's "corporate veil" should be pierced and James Pappas should be held personally liable for those fraudulent and illegal acts perpetrated in the corporate name.

195.    Justin Stuckey and Carrie Stuckey had knowledge of and/or a reckless disregard for, and participated in, the fraudulent acts carried out in the name of Maximum Mortgage.

196.    Justin Stuckey and Carrie Stuckey used Maximum Mortgage to promote the fraud, injustice, and/or illegal activities discussed above and derived personal benefit therefrom.

197.    Maximum Mortgage's "corporate veil" should be pierced and Justin Stuckey and Carrie Stuckey should be held personally liable for those fraudulent and illegal acts they perpetrated in the corporate name.

WHEREFORE, ABN prays that James Pappas be held jointly and severally liable for all judgments against Accelerated Title and that Justin Stuckey and Carrie Stuckey be held jointly and severally liable for all judgments against Maximum Mortgage and all other proper relief.

Respectfully submitted,

BARNES & THORNBURG

/s/ Christopher M. Forrest
Stephen L. Fink (#13971-49)
Gary C. Furst (#19349-64)
Christopher M. Forrest (#23571-53)
600 One Summit Square
Fort Wayne, Indiana 46802
Telephone:  (260) 423-9440
Facsimile:  (260) 424-8316

ATTORNEYS FOR PLAINTIFF

FWDS01 CFORREST 201086v1